### STEVENS v. OSCAR HOLWAY CO.

### SAME v. DOTEN GRAIN CO.

(District Court, D. Maine. September 7, 1907.)

Nos. 53, 54.

BANKRUPTCY—VOIDABLE PREFERENCES—PAYMENTS TO CREDITORS.

Evidence considered, and *held* to show that a bankrupt at the time he made payments to two creditors within four months prior to his bankruptcy knew himself to be hopelessly insolvent and intended such payments as preferences; that, when the first of such payments was made, the creditor receiving it did not have knowledge of the insolvency, nor reasonable cause to believe that a preference was intended, so as to render it voidable under Bankr. Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], as amended February 5, 1903 (32 Stat. 799, c. 487 [U. S. Comp. St. Supp. 1905, p. 689]), but that as to all subsequent payments which were made after the debtor had repeatedly made defaults and given checks, which were protested, both creditors were put upon inquiry, which, if made, would have disclosed the insolvency, and had reasonable cause to believe that preferences were intended.

In Equity. Suits by trustee in bankruptcy to recover preferences.

Robert T. Whitehouse, for Stevens, trustee.
Geo. C. Wing, for Oscar Holway Co.
Foster & Foster and Chas. A. Strout, for Doten Grain Co.

HALE, District Judge. Each of the above causes in equity is heard upon bill, answer, replication, and proofs. By agreement of counsel, the two cases are tried and argued together. In both cases the trustee seeks to recover, for the benefit of creditors, certain payments made by the bankrupt to the several respondents, within four months next preceding the filing of a petition in bankruptcy against him, on the ground that the payments were voidable preferences. The answers of the respondents admit the bankruptcy of the debtor and the receipt of the various payments on the dates alleged; but deny the insolvency of the debtor at the dates of the several payments, his knowledge of his insolvency, his intent to prefer, and that the respondents had any knowledge of the bankrupt's insolvency, or had reasonable cause to believe that he intended a preference by the payments.

Sections 60a and 60b of the bankruptcy act of July 1, 1898 (30 Stat. 562, c. 541 [U. S. Comp. St. 1901, p. 3445]), as amended February

5, 1903 (32 Stat. 799, c. 487 [U. S. Comp. St. Supp. 1905, p. 689]), provide that:

(a) "A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required."

(b) "If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person. And, for the purpose of such recovery, any court of bankruptcy, as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

The payments in question were as follows: A payment of $688.19 made to the Doten Grain Company on February 20, 1906, and $330 paid to the same respondent company on May 5, 1906; and the following payments made to the respondent, the Oscar Holway Company: $176 on April 12, 1906, $150 on April 13th, $135.02 on April 14th, and $43.02 on April 25th. It is admitted that all these payments were made within four months before the filing of the petition in bankruptcy.

1. The testimony shows that, at the time when all of the above payments were made, the debtor, William W. Blanchard, was insolvent, within the meaning of section 1, par. 15, of the bankruptcy act, which provides that:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

The testimony of the trustee establishes the fact that on February 20, 1906, the liabilities of the debtor were about $11,333, and that his assets amounted to $3,491, exclusive of the mill, which was mortgaged to its full value, and that there was therefore an excess of $8,844 of liabilities over assets, that on April 12th the total liabilities of the debtor were $13,385, and that his assets were about $3,000, showing a total excess of more than $10,000 liabilities over assets. On May 5, 1906, the liabilities, shown by the claims proven, were $12,220; and this sum is exclusive of $250 of unproved claims listed by the debtor as justly due. On May 9th a voluntary assignment was made at common law, and the inventory of the common-law assignee shows that the assets were about $3,000, leaving an excess of over $9,000 of liabilities at that time.

2. The testimony in the record shows that the effect of the enforcement of the several payments or transfers would be to enable the respondent creditors to obtain a greater percentage of their debts than any other of the creditors of the same class.

3. Did the debtor, knowing that he was insolvent, intend a preference by the said several payments?

In his testimony the bankrupt testified that he was insolvent, and that he knew he was insolvent, during the period of time covered by said payments. But the respondents contend that there is not sufficient evidence to prove that when he made the said several payments, or any of them, the bankrupt intended to create a preference to either of the several creditors.

Before discussing the several payments in detail, it is necessary to consider the law with reference to a bankrupt's intention to make a preference. In the Andrews Case, 144 Fed. 922, 75 C. C. A. 562, it was held by the Circuit Court of Appeals in this circuit that the intention to prefer must be an actual intent, and not an attributed one, and that it cannot be presumed from the fact alone that the debtor knew he was insolvent when he made the payment of a pre-existing debt. In speaking for the Court of Appeals, Judge Putnam said:

"It is true that the ordinary rule that a person who does an act is supposed to contemplate what results therefrom applies to cases of this class, but only as an element, and it cannot apply even as an element, unless the party who does the act has a knowledge of the essential facts which tend to produce the resulting consequences, or at least has a reasonable cause to believe them, or purposely shuts his eyes."

In the case at bar the testimony convinces me that, at the time when all the several payments were made, the bankrupt knew he was insolvent; that he knew the great excess of his liabilities over his assets; that his property was fully mortgaged; that his paper was long overdue; and that his creditors were "declining to wait any longer." The testimony is not so clear with reference to his intention to prefer when he made the payment of February 20, 1906, as when he made the subsequent payments; but, even when he made the earliest payment, I must conclude that he knew he was "hopelessly insolvent," and that he did, as a matter of fact, intend a preference in making such payment. And, in respect to the latter payments, the testimony does not leave room for the slightest question upon this point. I have no hesitation, then, in coming to the conclusion that, at the time when he made each one of the several payments, he, in the language of Judge Putnam, "had knowledge of the essential facts which tend to produce the resulting consequences."

I conclude in respect to each one of the several payments that the debtor, knowing he was insolvent, intended a preference.

4. It now becomes my duty to inquire, in respect to the several payments, whether or not each one of them was made by the debtor with the knowledge on the part of the creditor, or with a reasonable cause to believe, that it was intended thereby to give a preference.

Each payment presents a question of fact for the court to pass upon. The law is clear and undisputed. In the case of each payment, in order to sustain the complainant's allegation upon this point, he must show that, at the time the payment was made, the creditor had reasonable cause to believe the debtor to be insolvent. If facts in respect to the debtor's financial condition are brought home to the creditor, or such information is brought home to him as would put an ordinarily

prudent man upon his inquiry, then the creditor is chargeable with knowledge of the facts which such inquiry would reasonably be expected to disclose. Upon this point, the Andrews Case, supra, is controlling, especially when taken in connection with the decisions cited therein. Since that case, I do not find that the Supreme Court has given any decisions which throw any light upon the question; but, in the several circuits, there have been important decisions to the same effect.

In Hussey v. Richardson-Roberts Dry Goods Co., 148 Fed. 598, 78 C. C. A. 370, the Circuit Court of Appeals for the Eighth Circuit passed upon a case where a mercantile creditor had sold bankrupt goods only a few months prior to bankruptcy. The debtor was slow in making payments. The creditor learned that the debtor had placed a mortgage on his stock, and sent an attorney to look after the claim. The bankrupt stated to the attorney that he did not have sufficient capital to meet his bills promptly, but was doing a profitable business, and was entirely solvent; that he had an offer for his stock in cash and land amounting in value to a sum largely in excess of his indebtedness, which he could accept at once. The attorney advised its acceptance, and meantime took a chattel mortgage on the stock for the amount of his claim. The debtor was, in fact, insolvent and became a bankrupt within four months thereafter. The court held that such facts supported the finding of the District Court that, when the mortgage was taken, the creditor did not have a reasonable cause to believe a preference was intended, and that, hence, it was not voidable under section 60b of the bankruptcy act. It points out that while the giving of a preference by an insolvent, as defined by section 60a, affords sufficient ground for adjudication of bankruptcy against him, it may not be sufficient to make a transfer void under section 60b; but that, to accomplish the latter purpose, the additional fact must be shown that the one receiving the transfer had reasonable cause to believe it to be a preference. In that case the court held that the circumstances did not charge the creditors with sufficient knowledge to hold them with having accepted a preference. The same is true of the leading case, In re Eggert, 102 Fed. 735, 43 C. C. A. 1, which contains a valuable statement of the law and of the decisions up to June, 1900.

In Pittsburg Plate Glass Co. v. Edwards, 148 Fed. 377, 78 C. C. A. 191, the Circuit Court of Appeals for the Eighth Circuit passed upon a state of facts where the intention of the bankrupt to make a preference was inferred as a necessary consequence of his act in giving a mortgage while in financial embarrassment, and where an examination of the record impressed the court with the belief that the attorney was so well satisfied of the bankrupt's insolvency and its effect upon the mortgage he was about to take that he purposely "traveled as close to the edge of actual knowledge as he could without obtaining it."

In the case before me, the following facts appear in reference to the first payment, namely, that of February 20, 1906: Before October, 1905, the Doten Grain Company had no considerable amount of trouble with the debtor, Blanchard, in the matter of payments, although he had occasionally failed to meet his notes at maturity. There is testimony tending to show that checks of Blanchard were charged back

and protested in October and December, 1905; that a note fell due in December, 1905, which was unpaid until some weeks later; that in January, 1906, the creditor wrote to Blanchard, demanding payment by return mail of the balance of the note which had matured some weeks before; that the creditor wrote somewhat sharply, "We cannot allow these notes to get behind in this way." I will not detail all the evidence touching this payment. It is enough to say that the evidence tended to show that the debtor was under greater financial embarrassment than he had ever been before; that he was becoming slower in his payments. I have already found that, at the time of this payment, the debtor knew that he was hopelessly insolvent, and that he actually intended the payment as a preference; but the testimony does not fully show the knowledge of the bankrupt's condition on the part of the creditor which the bankrupt himself possessed. It is my duty to give the bankrupt the benefit of the doubt which arises in my mind as to whether the transaction of February 20, 1906, does not come within that class of cases where mere slowness of payment is held insufficient to put a creditor upon his inquiry as to the financial affairs of the debtor. I conclude that there is not sufficient evidence to hold the payment of February 20, 1906, to the Doten Grain Company to be a voidable preference; and I so decide.

5. On May 5, 1906, the debtor paid to the Doten Grain Company $330. The following facts appear in regard to this payment: That the last car of grain sold by the Doten Grain Company was on January 11, 1906; that in payment for this a note was given for $368.68 payable February 20th; that this note was not paid at maturity, but remained overdue and unpaid for over a month, during which time the creditors wrote late in February and late in March demanding payment; that on April 11th the creditors wrote again, threatening to take other measures unless the amount was paid; that on April 17th a check was sent by Blanchard for the amount; that the check was dated ahead to April 23d, and was protested for nonpayment on April 28th; that at that date the creditors again wrote to the debtor, stating that they were very much surprised, after the long time they had waited on the old note, to have the check protested for nonpayment; that the creditors further demanded that the debtor should immediately send them bills or a certified check for the amount, saying that they did not want the debtor to send them another check dated ahead, and that they would not wait any longer, but would take further steps; that, receiving no reply to this, on April 11th the president of the respondent company, by telephone, demanded payment of the debtor, and the debtor promised to send in the amount within a very few days; that, without giving the debtor an opportunity to fulfill his promise, the respondent sent its treasurer, Foster, to Canton. There is testimony on the part of the respondent that Foster was sent for the purpose of conferring with the debtor as to his habit of buying on sight drafts, and for the further purpose of inducing him to buy more goods. The whole testimony, however, convinces me that Foster was sent in order to obtain a payment. The testimony tends to show that the debtor told Foster that he was in good financial condition, and that he offered his books and invoices for examination; but

that, while Foster made inquiries of other persons as to the financial condition of the debtor, he did not examine the books and invoices which were tendered for his examination. Foster himself admits that his experience with Blanchard would ordinarily lead him to apprehend insolvency; and he details no facts which should be held to distinguish the case from the ordinary one. The testimony leads me to believe that, if he had examined the books and invoices which were tendered for his examination, he would have found the property fully mortgaged; that a recent mortgage had been put upon it; that cars had been obliged to stand on the track for 30 days before the debtor could obtain the money to pay his sight drafts; and that his creditors were generally demanding payment. In fact, he would have found a condition of affairs which resulted within four days in a voluntary assignment by the debtor.

The whole testimony in regard to this payment induces the belief in my mind that there were sufficient facts brought to the attention of the agent of the respondent corporation to put a reasonable man upon his inquiry; and that, if due inquiry had been made, facts would have been shown which would have made it apparent to the creditor that the payment was intended as a preference.

I hold, then, that the payment of May 5, 1906, to the Doten Grain Company, was a voidable preference.

6. Payments were made to the Oscar Holway Company on April 12, April 13, April 14, and April 25, 1906. The total amount of these payments is $504.04. The testimony tends to show that the Oscar Holway Company began to sell goods to Blanchard when he first started in business; that, up to the last part of 1905, all notes and checks were paid; that on November 15, 1905, he gave four notes of $500 each to apply to his account, which left a balance on open account of $332.22; that two of these notes were paid when they matured, and the others were not so paid; that the date of the last sale of goods to Blanchard by this respondent was August 25, 1905; that from this time the respondent company refused to do business with him. Mr. Martin, the treasurer, says the reason they ceased to do business with him was "because his payments were not satisfactory"; that his salesman, Mr. Webster, reported that the man was an expensive liver; and that as early as June, 1905, he had instructed his agents to cut down Blanchard's credit. In March, 1906, the debtor wrote, sending check in payment for the last of the four notes, and asking the creditors to hold same until the Monday following. This check was protested for nonpayment. Blanchard then wrote a letter, asking the creditors to send back the check to the Rumford Falls National Bank, so that it would be paid as his deposits went in. The company did as requested; but the check remained in the bank up to April 12th, and no deposits were made on it. The testimony shows that Martin knew that Blanchard had arranged to secure an additional loan upon his mill property from the Auburn Building & Loan Association, and that the property was then fully mortgaged. He knew also that creditors were pressing Blanchard everywhere, and, as he puts it, "other creditors were having great difficulty in collecting their debts from him." In this condition of affairs, Martin, the treasurer, sent Webster to

the debtor "to see what could be done about collecting the money." Webster testifies in regard to his attempts to obtain the payments. From his testimony it appears that he knew his corporation had stopped selling goods to Blanchard on account of his overdue bills; that the debtor was getting more and more behind in his accounts; that no attempts had been made to sell the debtor anything on credit after the fall of 1905; that he did not meet his notes when they became due; that he was an expensive liver; that all these facts had been reported to Martin, the treasurer, and that Martin had requested that no more goods be sold Blanchard on credit. Being asked, "When did you lose confidence in his ability to pay his debts in full?" Webster replied: "When he failed to meet his notes." With all this knowledge, Webster was sent by Martin to Canton with particular instructions to collect the money to pay the check which had been protested and which was lying in the bank waiting for deposits to take it up. He was sent a few days after the additional mortgage on the mill property was placed with the Auburn Building & Loan Association. The testimony convinces me that Webster was sent to collect the balance, or so much of it as he could. When he arrived, he told Blanchard that the payment must be made. Blanchard promised to pay him some at that time, but failed to do so. He then promised to pay him something the next day, but did not, as he says, "meet it at all." The next day, April 12th, he paid him $76. Webster then went home and came back the next day, called on Blanchard at least three times in succession that week, and obtained three payments, namely, on April 12th, 13th, and 14th. He finally went away leaving a balance unpaid, which he says he was unable to get; and he says further that he had lost confidence in Blanchard's ability to pay his debts. The testimony, then, tends to show that Blanchard's position was regarded as so hopeless that it was useless to attempt to obtain payment of any balance, and that two agents of this respondent corporation knew that the debtor's mill property was mortgaged to its full value, that he was unable to meet his protested check, and that he was being pressed everywhere.

In the case of the Mayo Contracting Company, in the Massachusetts District, in an opinion as yet unpublished, Judge Dodge holds that the same circumstances, which establish an intent to prefer on the debtor's part, also establish, on the part of the creditor, reasonable cause to believe that the debtor intended a preference. In the case at bar, with reference to the payments to this respondent, the same evidence which leads me to believe that the bankrupt intended to make a preference induces the belief, also, that this respondent had reasonable cause to believe such to be the debtor's intent. The whole evidence, taken together, leads me to the conclusion that an authorized agent of the respondent corporation had reasonable grounds to believe that the debtor was insolvent, and that, in making the payments to this respondent, he intended a preference. The payments to the Oscar Holway Company are held to have been voidable preferences.

A decree may be drawn in accordance with this opinion, with costs for complainant in each case.