GETTS v. JANESVILLE WHOLESALE GROCERY CO.

(District Court, W. D. Wisconsin.   August 13, 1908.)

**BANKRUPTCY—VOIDABLE PREFERENCE—KNOWLEDGE OF DEBTOR'S INSOLVENCY.**
Evidence considered, and *held* insufficient to sustain the burden of proof resting on a trustee in bankruptcy to show that a creditor at the time of receiving payment from the bankrupt had reasonable cause to believe him insolvent, so as to render such payment voidable as a preference; it being shown, among other things, that within a month prior to such payment, and when the conditions were practically the same, the creditor accepted the bankrupt as surety on a note, on receipt of which it shipped to the principal goods of substantial value, which it had previously refused to ship.

In Equity.   Suit by trustee in bankruptcy to recover preference.

Richmond, Jackman & Swansen, for trustee.
William G. Wheeler, for defendant.

SANBORN, District Judge.   Suit in equity to set aside a payment of $900 made on two judgments by confession recovered by defendant against S. J. Barry, bankrupt, May 17, 1907.   The adjudication was July 24, 1907.   Suit is brought on the ground that the payment was made while Barry was insolvent, and that the effect of the enforcement of the payment would be to enable defendant to obtain a greater percentage of its claim than other creditors of the same class; also, that defendant, at the time of receiving the money, had reasonable cause to believe that the bankrupt, in making the payment, intended thereby to give a preference.

The facts are that some time prior to his bankruptcy Barry was in the retail grocery business at Oregon, a small village in Wisconsin, near Janesville, where defendant carried on a wholesale grocery business.   Barry was then associated with one F. W. Coward, as a partner.   Some time prior to November, 1906, Barry and Coward dissolved the partnership, and Barry continued the business.   On November 10, 1906, Barry called on defendant at Janesville for the purpose of settling up his account, and it was adjusted by his giving a note for $332.04, due in 60 days.   He also asked for credit with defendant, and was requested to give a property statement.   The secretary of defendant wrote a statement of the items given by Barry.   The statement was signed by the latter, and showed that he had a farm of 127 acres near Oregon, worth $100 an acre, and that his stock of goods was worth $4,000.   It further showed that the farm was incumbered by a mortgage for $4,800.   His debts were put in at less than $1,000; the net amount of his property being stated at $11,200.   As a matter of fact, Barry's title to the farm was subject to a life estate of his father, then 82 years old, which was worth about $2,000, and he owed debts amounting to nearly $8,000, and, instead of being worth $100 an acre, the farm was worth only $75 an acre, and the stock of goods was worth much less than $4,000.   Barry was probably insolvent at the time of making the statement by at least $2,000.   However, defendant had no knowledge of the facts, and no reasonable cause for believing that the statement was untrue.   It extended further credit

to Barry. In February, 1907, his stock of goods was largely destroyed by fire. It was insured, and he obtained $700 from insurance thereon, besides some salvage. Barry then ceased business as a merchant, except to dispose of the goods saved, became a wage-earner, and was such at the time of filing his voluntary petition, July 23, 1907. Defendant learned of the fire shortly after its occurrence, and in April, 1907, its attorney, and also its manager, were informed that the stock of goods shown by the statement to have been worth $4,000 had been settled for by the insurers for about $700, and that a small amount of goods was saved. They also learned that Barry had gone out of the business and was working by the day. With this information of Barry's condition, defendant apparently supposed that he had no property except the real estate, which was shown in the statement to be worth $12,700, subject to a mortgage of $4,800. For this reason defendant desired to make its claim, then amounting to $327.49, a lien on the farm. With this end in view, defendant sent an attorney to Oregon to procure a note or obtain some disposition or satisfaction of the claim and to look up the situation and decide what to do. When he arrived at Oregon he interviewed an attorney, Mr. Haskell, and also talked with the cashier of the local bank. Mr. Haskell informed him that he had some small claims against Barry, and advised him not to bring suit on the claim because it might precipitate bankruptcy proceedings, but that, if he got a judgment note and filed it against the farm and kept quiet for three months (meaning four months), the claim would become a lien and could not be disturbed by bankruptcy proceedings. Mr. Tallman, attorney for the defendant, says that Mr. Haskell may have been the first one to suggest the taking of a judgment note. The cashier of the bank informed Mr. Tallman that Barry had this farm and was good for a reasonable amount. This was on the 15th day of May, 1907, two months before the bankruptcy. On the same day Mr. Tallman took an ordinary promissory note from Mr. Coward in favor of defendant for $654.84, being the amount due from Coward to the company. Mr. Tallman returned to Janesville with the notes, but was instructed by the president of the defendant to return to Oregon the next day and obtain a judgment note from Coward, with a surety. Mr. Tallman returned, accordingly, and asked Mr. Coward to obtain Mr. Barry as surety. The amount due from Mr. Coward included some goods still in possession of the defendant, amounting to about $400, which defendant would not ship to Coward until they were paid for or the amount properly secured. It was arranged that, if Mr. Coward could procure Mr. Barry as surety on a judgment note, these goods would be shipped to Mr. Coward, and it was stated to Mr. Barry that Mr. Coward, out of the proceeds of these goods, would be able to pay a considerable part of the amount of the note. Mr. Barry, accordingly, signed the judgment note with Mr. Coward. When Mr. Tallman returned to Janesville, he was instructed by the president of the company to enter up judgment at once on both of the notes. Accordingly, on May 17, 1907, he went to Madison and entered up judgment by confession on both notes. Some time prior to the 17th of June, Mr. Barry desired to secure the payment of a debt due from him as a guardian or trustee

to his bondsmen, and learned for the first time that the judgments had been entered and had become a lien on his farm. It therefore became necessary for him to procure a release of the judgments, if possible, in order to secure the fiduciary claim. Thereupon he borrowed $1,000 of his sisters, taking from them two certificates of deposit on the bank of Oregon for that amount, and went to Janesville, and told the president of the defendant that he wanted to satisfy the judgments, and asked some concession in the amount, and it was finally agreed that, if he paid $900, the judgments would be discharged. Mr. Tallman and Mr. Barry, accordingly, went to Madison, where the money was paid and judgments released; Mr. Barry giving his sisters a mortgage on the farm for the amount borrowed of them. In April, 1907, two checks given by Barry to defendant on the Bank of Oregon were protested for want of funds; Barry's deposit then amounting to only $55, and the checks exceeding his account.

The question for decision is whether defendant took the payment while having reasonable cause to believe it was intended as a preference. Barry's insolvency and consequent intent to prefer are clear, but whether reasonable cause so existed is one of much doubt. This is generally a question of difficulty, and the case is no exception to the rule. While defendant had knowledge of facts which might justly make it suspect Barry's solvency, yet it trusted him by taking his signature as security for $654.84, and on the strength of that security it turned over to him his principal goods, valued at $400. This and other circumstances make the question one of reasonable inference from facts and circumstances, some of which are not entirely clear, nor sustained by clear or unmistakable testimony. Thus, the testimony of Mr. Haskell of his interview with Mr. Tallman depends, not on his present recollection, but on a memorandum made by him some time after the interview, although before he knew that his recollection would be material to any controversy.

Many decisions on the subject have been made, both under the act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517) and the act of 1898 (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]). Those under the earlier act which find no reasonable cause are now rather stronger as precedents in favor of the preferred creditor, because insolvency by the act of 1867 consisted in the inability to meet claims as they matured, while by the later act a much broader test is prescribed, and those which find reasonable cause existed are now weaker as precedents against the preferred creditor. The leading case under the act of 1867 is Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971, followed by the Circuit Court of Appeals of this circuit in the case of In re Eggert, 102 Fed. 735, 43 C. C. A. 1, 4 Am. Bankr. Rep. 449. In the Grant Case, the court states the rule as follows:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the

> fact. He may be unwilling to trust him further. He may feel anxious about his claim, and have a strong desire to secure it, and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances, is not prohibited by the law. Receiving payment is put in the same category in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside, and yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose. It is on this distinction that the present case turns. It cannot be denied that the officers of the bank had become distrustful of Miller's ability to bring his affairs to a successful termination, and yet it is equally apparent, independent of their sworn statements on the subject, that they supposed there was a possibility of his doing so. After obtaining the security in question, they still allowed him to check upon them for considerable amounts in advance of his deposits. They were alarmed, but they were not without hope. They felt it necessary to exact security for what he owed them, but they still granted him temporary accommodations. Had they actually supposed him to be insolvent, would they have done this?"

Defendant in this controversy was undoubtedly suspicious and anxious to secure its claim. It knew that goods stated to be worth $4,000 in November, 1906, had been settled for by insurers for $700 in April, 1907. It knew that Barry's checks had been protested, and that he was out of business and hard up. It was informed, if we may credit Mr. Haskell's memorandum of a past recollection, that there was some danger of Barry's bankruptcy, although at that time he was a wage-earner, and apparently could not be made an involuntary bankrupt. On the other hand, it relied on Barry's property statement, and trusted him, within a month before receiving the payment, by taking his signature as surety on a note of more than $600, and in reliance thereon delivered goods worth some $400.

The burden of proof to show reasonable cause is on the trustee. The presumption of law is that defendant did not have reasonable cause to believe a preference was intended (In re Pfaffinger [D. C.] 154 Fed. 523), and I am clear that the evidence does not overcome this presumption. The inferences are not clear. Some of the evidence is inconclusive. In this situation of the proof, the fact that the creditor did trust the bankrupt by accepting him as a surety for a substantial sum is entitled to considerable weight. Coder v. Arts, 152 Fed. 943, 82 C. C. A. 91. This is not a case where the attorney of the creditor "traveled as close to the edge of actual knowledge as he could without obtaining it," because he trusted the bankrupt by taking the Coward judgment note, thus showing belief in Barry's solvency. Stevens v. Oscar Holway Co. (D. C.) 156 Fed. 90; Hussey v. Richardson Roberts Dry Goods Co., 148 Fed. 598, 78 C. C. A. 370.

The bill of complaint, as amended on the hearing, is dismissed, with costs.