SMITH v. COURY et al.

(District Court, D. Maine.  January 3, 1918.)

No. 760.

1. BANKRUPTCY ⏆159—PREFERENCES—"CREDITORS"—WHO ARE.
    Indorsers and guarantors of notes and obligations of a bankrupt are creditors, within Bankruptcy Act July 1, 1898, c. 541, § 60, subd. b, 30 Stat. 562 (Comp. St. 1916, § 9644), relating to preferences.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Creditor.]

2. BANKRUPTCY ⏆165(1)—PREFERENCES—WHAT CONSTITUTES.
    Under Bankruptcy Act, § 60, subd. b, declaring that if a bankrupt shall have made a transfer of any of his property, and if at the time of the transfer, etc., and being within four months before the filing of the petition in bankruptcy, or after the filing thereof, and before the adjudication, the bankrupt be insolvent and the transfer, etc., then operate as a preference, and the person receiving it or to be benefited thereby, or, his agent acting therein, shall then have reasonable cause to believe that the enforcement of such transfer, etc., will effect a preference, it shall be voidable by the trustee; a transfer by insolvent debtors within four months of bankruptcy to creditors, or agents of creditors, who had reasonable cause to believe that the transfer would operate as a preference, is voidable as such, even though the creditors only received indirect benefit from the transfer by being relieved of their indorsements or guaranties.

⏆For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKRUPTCY ⊕⇒303(3)—PREFERENCES—EVIDENCE—SUFFICIENCY.

In a suit by trustee to set aside a conveyance as a preference, evidence *held* to show that the grantees in receiving the conveyance were acting as agents of the creditors, within Bankruptcy Act, § 60, subd. b, declaring voidable as preferences transfers, where the creditors or their agents had reasonable cause to believe that they would effect a preference.

4. BANKRUPTCY ⊕⇒165(3)—PREFERENCES—TRANSFER VOIDABLE IN PART.

Though a transfer of property by a bankrupt was in part for a new consideration, and to that extent was not bad as affecting a preference, nevertheless the remainder of the transaction is, or may be, subject to attack, under Bankruptcy Act, § 60, subd. b, as preferential.

5. BANKRUPTCY ⊕⇒166(3), 175—TRANSFERS—DELAY OF CREDITORS.

Under Bankruptcy Act, § 67, subd. e (Comp. St. 1916, § 9651), declaring that all conveyances, etc., made by a person adjudged a bankrupt, and within four months prior to the filing of the petition, with intent on his part to hinder, delay, or defraud creditors, shall be null and void against the creditors of such debtor, except as to purchasers in good faith, etc., a conveyance which the grantee knows, or has reason to believe, will be preferential, because of the insolvency of the debtor, is fraudulent and void: for a transfer may be bad both as preferential and as one intended to hinder and delay creditors.

6. BANKRUPTCY ⊕⇒166(4)—CONVEYANCES—VALIDITY.

Under Bankruptcy Act, § 67, subd. e, a creditor who accepts a transfer or conveyance from a debtor, and has such information as to lead an ordinarily prudent man to believe he is being preferred, is chargeable with knowledge of the facts, which inquiry would have disclosed, and, if inquiry would have shown the transfer was preferential, it is bad as in fraud of creditors.

7. BANKRUPTCY ⊕⇒303(3)—TRANSFERS—EVIDENCE.

In a suit by a trustee, evidence *held* to show that creditors who received a preferential transfer from the bankrupt took with knowledge of that fact, so that the transfer was one in fraud of creditors, voidable under Bankrupcy Act, § 67, subd. e.

8. BANKRUPTCY ⊕⇒212—TRANSFERS—SETTING ASIDE.

Whether a mortgage was a valid claim against the bankrupt estate cannot be decided in a suit by the trustees against others to set aside another conveyance as preferential and in fraud of creditors, those interested in the mortgage not being before the court.

9. BANKRUPTCY ⊕⇒303(3)—TRANSFERS—EVIDENCE—SUFFICIENCY.

In a suit by the trustee in bankruptcy, evidence *held* sufficient to show a conspiracy between the bankrupts and defendants, whereby the bankrupts, before the filing of the petition, fraudulently transferred goods and merchandise to defendants.

In Equity. Suit by Carl W. Smith, trustee in bankruptcy, against Amos Coury and others. Decree for complainant.

Woodman & Whitehouse, of Portland, Me., for plaintiff.

A. S. Crawford, Jr., of Ft. Kent, Me., and Wm. R. Pattangall and Herbert E. Locke, both of Augusta, Me., for defendants.

HALE, District Judge. The Bankruptcy Act provides, in section 60(b), that if an insolvent debtor has, within four months before filing his petition in bankruptcy, made a property transfer, operating as a preference, and which the person receiving the same or to be benefited thereby, or his agent acting therein, has reason to believe was intended to give a preference, the transfer shall be voidable, and the trustee in bankruptcy may recover the property or its value. The act

also provides, in section 67(e), that if the bankrupt, within four months . before the filing of the petition in bankruptcy, makes any transfer "with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them," it shall be null and void as against his creditors, except as to purchasers in good faith and for a present fair consideration, and that it shall be the duty of the trustee to recover the same.

Kenin Hobart and Simon Hobart, both of Ft. Kent, in Aroostook county, in this district, are Syrians; they are brothers. For some years they kept a country store at Ft. Kent in partnership with their cousins, Amos Coury and Selim Coury. Not being successful in trade, they dissolved early in 1915; and, upon dissolution, the Hobarts took the real estate and the stock in trade, and assumed the liabilities, which are said to have amounted to as much as the stock in trade, about $5,000.

After this dissolution, the Hobarts went into business individually, and continued to do business in this way until September, 1915, when they went back into partnership in the dry goods and clothing business, doing business as "K. Hobart & Bro." In the autumn of 1915, Amos and Selim Coury were also engaged in the same business, having stores at Ft. Kent, Eagle Lake, and Frenchville. In September, 1915, the Hobarts began to increase their stock. During the three months from September 1st to December 1st they purchased new goods, which, according to the invoices, amounted to $6,477. This was added to the stock on hand, which is variously stated to have been worth from $3,500 to $7,000. During the autumn of 1915 the Courys found out that the Hobarts were not doing a good business; that they were losing money; that they were deeply in debt; and were neglecting their business and wasting their money. The Hobarts were in the habit, at this time, of borrowing money from the Courys, or on their indorsement, from time to time. These loans are shown to have amounted to nearly $3,800, not including guaranties made by the Courys of something over $300.

On December 2, 1915, an attachment was put on the real estate of the Hobarts by J. H. Brackett Company of Portland on a debt of $109. The Hobarts applied to the Courys for help, saying that they could not raise the necessary amount to release the attachment, and asking the Courys to go on a bond for $200. Amos and Selim replied that they had already let the Hobarts have too much. They refused to go on the bond, unless the Hobarts would deed to them all the real estate, at a valuation of $7,000, to be applied against the debts of the Courys, and the notes on which they were liable as indorsers, and on the bills which they had guaranteed, and on moneys loaned by their wives and sisters, all of which, according to their statement at that time, amounted to $4,259. Accordingly, on December 2d, the Hobarts executed a warranty deed of the store, and the land and buildings owned by them in Ft. Kent, to the Coury Bros., subject to four mortgages enumerated, amounting to $3,100. This piece of property, covered by the warranty deed, had upon it a store building taken from a piece of land called lot 32, which had been covered by a mortgage to Israel Shur, enumerated in the mortgages to which I have referred. On the same

date with the warranty deed, an agreement was entered into in writing between the Hobarts and the Courys, and left in the hands of their attorney, but not recorded or otherwise made public, by which it was agreed, in substance, that the property should be taken by the Courys at the purchase price of $7,000; that, in consideration of the conveyance, the Courys should cancel their own indebtedness against the Hobarts, paying the notes at the Ft. Kent Trust Company on which they were liable as indorsers, paying the old bills which they had guaranteed, also the new bills on which they had not been previously liable, namely, the Brackett bill of $109, and a bill to Hannaford Bros. of $64.13, and paying off the claims of their wives and sisters; that if the amount of these claims, added to the mortgages, was less than $7,000, the Courys were to pay the Hobarts the difference between the amount of the debts and incumbrances and the purchase price of $7,000; but if the same exceeded $7,000, then the Hobarts were to pay the Courys the excess, to wit, the amount by which the debts and incumbrances exceeded the purchase price of $7,000. The Courys thereupon went on the bond for $200; and the Brackett attachment was released. Eight days later, on December 10, 1915, the Hobarts made a common-law assignment to their attorney for the benefit of creditors. Six days after, on December 16, 1915, an involuntary petition in bankruptcy was filed against them, both individually and as copartners. On January 6th they were duly adjudged bankrupts in both capacities; and on January 29th the plaintiff, Carl W. Smith, was duly qualified as trustee in bankruptcy.

After the filing of the schedules, it is found that the total tabulation of assets and liabilities, as shown in the inventory, discloses liabilities to the amount of..............................$13,578 08
And assets to the amount of.......................... 5,300 05

Showing an excess of liabilities over assets of $ 8,278 03

The trustee in bankruptcy now brings this bill in equity against Amos Coury and Selim Coury, joining also as defendants Lizzie Coury, wife of Amos, Madeline Coury, wife of Selim, and Annie and Hazizey, sisters of Amos and Selim. The bill seeks to recover preferences under section 60(b) of the Bankrupt Act, and to set aside fraudulent transfers, under section 67(e) of the act. It charges a fraudulent conspiracy between the bankrupts and the Courys to transfer the store property of the Hobarts at Ft. Kent, constituting all their real estate, to the defendants Amos and Selim, by a deed absolute in form, but for an inadequate consideration, namely, certain debts due from the Hobarts to the Coury Bros., also notes of the Hobarts placed with the Ft. Kent Trust Company on which the Coury Bros. were liable as indorsers; also certain debts claimed by the Hobarts to be due to Lizzie, Annie, Madeline, and Hazizey, for whom, it is alleged, Amos and Selim were acting as agents, amounting in all to about $3,000, as the consideration for a transfer of the real estate, which was incumbered by certain mortgages, leaving an excess alleged to be $5,025. It is alleged that the defendants proposed to conceal the existence of this excess value from their creditors and from the common-law as-

signee, and from the trustee in bankruptcy, thereafter to be appointed, and that they were seeking to make a preference as to the amounts actually received and retained by the Courys on account of their claims.

The original bill related only to the transfer of the real estate. Soon after the filing of that bill, an amendment was filed, setting forth, as a part of the same conspiracy, that, between October 1 and December 1, 1915, the Hobarts should transfer goods in their store to the Courys, for the purpose of concealing those goods from their creditors, and thus hindering, delaying, and defrauding the creditors, and constituting a fraudulent transfer under section 67(e) of the Bankrupt Act.

[1, 2] 1. In order to make a preference under section 60(b), it is necessary for the plaintiff to show that the debtors were insolvent at the time they made the transfer; that it was within four months of filing the petition in bankruptcy; that its effect was to give a larger percentage to the defendants than to other creditors of the same class; that the persons receiving the preference were to be benefited by it, either by direct payment of their debt, or by relieving them from their indorsements or guaranties; that they were acting as agents of others who were so benefited; and that the persons or the agents had reasonable cause to believe that a transfer would operate as a preference.

It is clear that the deed of December 2d was a transfer within the meaning of the act, and was within four months before the filing of the petition in bankruptcy; that the Hobarts on December 2, 1915, were insolvent. They were insolvent on any showing brought to my attention either by the plaintiff or by the defendants; and this insolvent condition clearly existed on the day of the transfer, December 2, 1915, on the day of the making of the common-law assignment, December 9th, and on the day of the filing of the petition in bankruptcy, December 16th. It is clear that Amos and Selim were directly benefited, both by the cancellation of their direct claims against the bankrupts, and by being relieved from their indorsements on notes in the Ft. Kent Trust Company, which are in evidence, amounting to over $1,-400; for there can be no question but that indorsers and guarantors are creditors within the meaning of section 60(b). Collier (11th Ed.) 810, cl. 2; Stern v. Paper (D. C.) 183 Fed. 228, 231; Huttig Mfg. Co. v. Edwards, 160 Fed. 619, 87 C. C. A. 521.

[3] The evidence shows that there were certain debts owing to the wives and sisters. Under section 60(b), it is sufficient if the person receiving the transfer is agent for the person to be benefited. It is contended on behalf of defendants that the evidence should not induce me to find that Amos and Selim were agents for their wives and sisters. The evidence as to the conduct of their business, however, leaves me in no doubt that the agency existed; and Selim testified affirmatively that his sisters gave to him and to Amos all their business, "and we were to do it ourselves for them."

[4] The proofs show that among the items which, by reason of the agreement of December 2, 1915, Amos and Selim Coury agreed to pay, were two bills on which they were not previously liable, the Brackett bill of $109, and an account of Hannaford Bros. of Portland for

$64.13; for these two bills, amounting to $173.13, there was a present consideration; and to this extent the transfer was not voidable as a preference under section 60(b). This does not, however, prevent the rest of the transaction from being a preference within that section.

[5] We now meet the more important question whether the whole transaction should be held to be a transfer made with intent to hinder, delay, or defraud creditors. Under section 67(e) the basis of invalidity is much broader than under section 60(b); it covers every transfer made by the bankrupts within four months before the filing of the petition with the intent and purpose to hinder, delay, or defraud their creditors or any of them; for a transaction may be invalid both as a preference and as a fraudulent transfer.

It is clear that, whatever the conveyance be, wherever the transferee receives property and advances, or pays money therefor, with knowledge or reason to believe that the money so advanced is to be used to make a payment to creditors, which would be preferential because of the insolvency of the maker of the transfer, it is a fraudulent transfer and void, under section 67(e). In Dean v. Davis, 242 U. S. 438, 37 Sup. Ct. 130, 61 L. Ed. 419, speaking for the Supreme Court, Mr. Justice Brandeis has made a clear exposition of the law on this subject, and has added a table of valuable citations. In Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 582, 33 Sup. Ct. 343, 57 L. Ed. 652, the distinction is pointed out between the intent to prefer and the intent to defraud. It is shown that one is inherently always vicious; the other innocent and valid except when made in violation of the express provisions of a statute. A fraudulent conveyance is void regardless of its date, while a preference is valid unless made within the prohibited period.

[6, 7] It is necessary then to inquire whether Amos and Selim Coury acted in good faith, and thus received a conveyance unassailable under section 67(d), or whether they had reason to believe and to know that the debtors were making a preferential payment with bankruptcy in contemplation. If they did, the transaction was fraudulent, and was clearly within section 67(e). It is contended by the learned counsel for the defendants that the Coury Bros., whether they acted for themselves alone, or for themselves and their wives and sisters, did not have reasonable cause to believe that the transfer would operate as a preference, but that the testimony tends to show that the Courys had reason for suspicion only, and not for belief or knowledge. In Stevens v. Oscar Holway Co. (D. C.) 156 Fed. 90, this court laid down the rule:

"If facts in respect to the debtor's financial condition are brought home to the creditor, or such information is brought home to him as would put an ordinarily prudent man upon his inquiry, then the creditor is chargeable with knowledge of the facts which such inquiry would reasonably be expected to disclose."

Collier says (11th Ed.) 815:

"If a creditor accepts a transfer under circumstances which would lead a man of ordinary prudence and sagacity to believe that he was being preferred over other creditors of the same class, without making investigation, he would be chargeable with all the knowledge which he would have acquired had he performed his duty in this regard."

The proofs show that close family relations existed between the defendants and the bankrupts; that the Courys knew the Hobarts were doing a losing business; that they were not attending to their trade; that they were increasing their indebtedness all the time; that on December 2, 1915, they were conveying away all their real estate. Simon Hobart admitted that he knew of his insolvency, and that the effect of the transfer would be that creditors, other than the Courys, would not get their pay. He must then have known that the effect of the transfer would be to hinder, delay, and defraud creditors. His brother must have known it. The proofs convince me, too, that Amos and Selim Coury had such facts brought home to them as would put reasonably prudent men on inquiry, and that inquiry would inevitably have revealed insolvency. They must be held then to have known that this transfer would effect a preference, and would hinder, delay, and defraud other creditors. I am satisfied that the transaction in question was voidable in its entirety as a transfer made with intent to hinder, delay, and defraud creditors under section 67(e).

[8] In reference to the Shur mortgage, to which I have already referred, the learned counsel for the plaintiff urges that in this proceeding the court may pass upon the question whether this mortgage was a valid claim against the Hobart real estate, covered by the deed of December 2d. I think not. In this proceeding all the necessary parties are not before the court to enable it to found a decree that the Shur mortgage shall be enforced to any extent as an incumbrance against the store building. This question must be considered in some further proceeding.

[9] 2. The plaintiff says that the conspiracy between the bankrupts and these defendants involved a further fraudulent transfer. It is alleged, as a part of the conspiracy, that in the autumn of 1915 the Hobarts owed the Courys about $4,200 on direct loans, indorsements, and guaranties; that the Hobarts had been doing an unsuccessful business, and that they, together with the Courys, arranged a scheme of going through the form of a failure for the purpose of securing the Courys; that with this in view they bought an unusually large quantity of goods during the autumn of 1915; that they openly transferred the real estate to the Courys, thus hoping to make it appear to the public that this was their only transfer of property, and that they also turned over secretly to the Courys enough goods to entirely secure them for all their indebtedness, and that they did this from the new stock which had just been put into their store, leaving the old stock in trade to be divided among the other creditors.

Here we have an important question of fact, a question presenting some difficulty. It appears in evidence that Simon Hobart went to New York in September, 1915, accompanied by Amos Coury, and that he there began to make extended purchases of goods for his store; that during three months after September 1, 1915, over $6,000 worth of goods were purchased and went into the store of the Hobarts; that the greater part of these goods went into the store between September 10th and November 1st. No testimony has been offered tending to show any great diminution of these goods by the ordinary store sales; it does

not appear that creditors were receiving much pay; although the learned counsel for the defense urges, by way of explanation, that during this period creditors were paid out of the product of sales of new goods. No receipted bills are shown to account for payments at this time. It is contended, also, that living expenses accounted for the deficiency; but it is impossible to believe that in three months between five and six thousand dollars could have been expended by the bankrupts in their little town for ordinary expenses of living. Talk is made also that gambling and sporting accounted for money expended, but no proofs give weight to this suggestion. It appears from competent testimony that almost all the goods remaining in the store at the time of the bankruptcy were old goods; very few of the new goods, which had unquestionably come into the store, were found at the time of the bankruptcy. It appears, then, from competent proofs, that nearly $5,000 worth of new goods, which came into the store between October 1st and November 1st, had disappeared 30 days later. No proofs are presented to account for the bodily disappearance of all these goods.

Upon this point there is some direct evidence. Kalil Ziter testifies as follows:

"Q. After you returned home on December 12th, state whether or not you had any talk with Mr. Selim Coury about the circumstances of the Hobart failure? A. I had. Q. Kindly tell us what took place? A. Yes, sir. On December about the 15th, 1915, I was invited to Amos Coury's house for supper, and, during our talk that evening, Selim Coury came alongside of me and he says: 'Ziter, I suppose you heard something about Hobart's failure.' I says: 'Yes; I have heard something, but I don't know nothing about it.' 'Well,' he says, 'I will tell you the whole story.' He says: 'Hobart doesn't fail to make any money at all.' He says: 'They was obliged to do it.' I says: 'How is that and why is that?' He says: 'Simon came to my store one day and asked me to loan him some money. And I said: "Simon, we have trusted you quite a little; I like to know something about your business."' Q. Did he say when this was? A. That was during November; Mr. Coury came up to Hobart's store— Q. Which Coury? A. Selim Coury. Q. Is that what he told you? A. Yes. That was his story that same evening; and examined Hobart's books, and took account of their stock and found that they cannot pay their bill very well. He said: 'Boys, I don't want to trust you any more.' He says: 'Your standing isn't very good. I am afraid you will have to do something. Either you will have to have a settlement with your creditors or fail.' 'And,' he says, 'I will try very hard and get a settlement for you through your creditors; if you will take my advice you will have to do that to get along.' He says: 'But, before you have made an assignment or any failure you will have to pay us what you owe us.' Simon says: 'How could we do that; we haven't got money?' 'Well,' he says, 'I will take merchandise for our account.' Two or three days after that they pack up some goods and take it down to Frenchville. He had a store then in Frenchville. Q. Who did he say packed up the goods? A. He and Simon. Q. Did he state how the goods were taken to Frenchville? A. Yes; they have a great big cart or wagon. Q. Whose cart was it? A. Simon's. Q. What kind of a cart? A. Great big red cart; peddler's cart. By the Court: Horsecart? A. Yes, sir; double horsecart. Q. Did he tell you any of the conversation; whether anything was said between him and the Hobarts regarding the real estate? A. Yes; and he also said: 'You will have to transfer the property to our name.' Q. What property? A. The real estate. The two houses and land which they have there. And he says: 'We will hold it for you fellows until you get settlement with the creditors; and then, after you get settled, we will return the property to your name.' Q. Did he state whether the Hobarts agreed to that or not? A. Yes, sir; they had agreed to it at that

time. They said: 'All right; we will do as you say.' Q. Now, later on, some time in the summer of 1916, did you have any other talk with Selim about this matter? A. Yes, sir; about the last of June, 1916, I was in to Amos's house also, and I had an argument with Selim in regard to Hobart's failure. I says: 'Selim, I can't believe that Hobarts failed and lost everything they had in such a short time as this.' He says: 'Believe me, Ziter, the boys they haven't got one cent to-day. They have lost everything they have got, and still they owe us a little balance.' I says: 'I cannot believe it; you couldn't put that through my head, that Hobarts have lost everything they have got and still owe you some money.' He says: 'You come along with me and I will prove it to you.' So I went down with him to his store, and went right in and he opened the safe and pulled out a statement which was written in Assyrian language—in our language—and he showed me where their indorsed note to the Ft. Kent Trust Company and to some of the creditors. He showed me where they owed his sister Annie Coury some money and his wife—his brother's wife. Also he showed me where all that he received on account from them. It was by merchandise—two or three items—it was. The total amount was $4,280, and there was a little balance of $200 and some odd dollars. Q. If I understand you, on this Assyrian statement that Selim showed you, there were credits of merchandise received— A. Received on account. Q. From the Hobarts by the Courys? A. Yes, sir. Q. Of $4,280? A. Yes, sir. Q. Did it state during what month that was received? A. Yes; during November. Q. Now, Mr. Ziter, did you, at some time during this period, ask Amos Coury or Selim Coury—I have forgotten which—for the loan of some packing boxes—empty crates or boxes? A. No; he asked me to let him have a few empty boxes, Selim did. To loan him some empty boxes to move some goods from Eagle Lake to Ft. Kent—at one time. So I did. I loaned him five empty boxes. It went along three or four weeks, and I commenced to ask him to return me those five boxes. I didn't really need them, but I wanted them. He kept on saying: 'I will send them to you; I will send them to you.' One day I says: 'I want them.' He went and sent me five boxes from his store, by a truckman, at that time, by the name of Fred Roberts. The five boxes was kind of smaller than the ones I loaned him. I went and examined the boxes, and there was the name 'K. Hobart' on some of them, and 'Simon Hobart' on some of them—some of the boxes."

Kalil Ziter is corroborated to some extent by his brother Michael, who gives a more general account of facts which he learned from conversations with Simon Hobart and Amos Coury. His memory is that the statements made to him were to the effect that about $3,000 worth of goods was turned over by the Hobarts to the Courys. He testifies also to seeing goods which came from the Hobarts being hauled by his store to the Courys. He says, too, that about two or three weeks after the Hobart failure, Amos told him that he took the real estate to hold it for Kenin Hobart and brother, and later to give it back after the failure was settled. He gives other testimony somewhat corroborative. Michael was of uncouth appearance; but he did not seem capable of getting up an elaborate falsehood. After hearing the testimony of Kalil, and personally seeing him and questioning him, I cannot believe that his whole testimony is false. It is urged with much force that, if Kalil and Michael had been conferring with reference to getting up a story, each would have given a different kind of testimony; for in details they do not agree, and, on the whole, Michael's testimony has some corroborative force. Kalil testified positively that an account exhibited to him by Amos Coury shows a credit of merchandise delivered by the Hobarts to the Courys of $4,280, and that there was still an unpaid balance of about $200. Learned counsel for the defendants urge that Kalil Ziter was not on such terms with Amos as

to make it probable that Amos would have made any such disclosure to him. About this there is much conflict in the proofs. I do not find that there is anything conclusive offered either way. On the whole, I think the testimony fails to show any such ill feeling between the parties as to render the conversation improbable. It must be remembered that from Selim Coury's point of view he was making no confession; he apparently saw no moral wrong in what he was doing, in securing payment of the Coury account by taking over the Hobart stock. He apparently saw nothing to be ashamed of in receiving some preference from his relatives, and in holding real estate, through bankruptcy proceedings, as a security to both himself and to his relatives, and in making sure that the account of himself and family was paid, while other creditors were not so fortunate. I can find no adequate motive for the Ziters testifying falsely in regard to the admissions which they say were made to them by Selim Coury. It is urged that the Ziters did not make these disclosures until about a year after the circumstances occurred which they undertook to relate; but it is worthy of consideration that at first they made these disclosures to an attorney acting for the trustee, after this attorney had approached them, and, as is said, 'dug it out of them.' There is force in the suggestion of the plaintiff that, if the Ziters had ill will against the Courys, they would not have waited a year, while bankruptcy proceedings were going on, saying nothing to anybody about the story during that time, but would have hastened to tell their story at an early stage of the bankruptcy proceedings. They did not volunteer, but admitted the story, only after being closely questioned by the attorney for the trustee; they then made a full disclosure. The question is not entirely free from doubt; but, on all the proofs, I am constrained to come to the conclusion that, during the autumn of 1915, the Hobarts bodily transferred goods and merchandise to the value of $4,280 from their store to the store of the Courys; that they did this for the purpose of paying the Courys that amount of money for an old debt; and that they thereby effected a fraudulent transfer within the meaning of section 67(e) of the Bankrupt Act.

The plaintiff is entitled to a decree—First, for a conveyance to himself, as trustee in bankruptcy, of the real estate described as having been conveyed to Amos and Selim Coury by deed of December 2, 1915; second, the plaintiff is also entitled to a decree that Amos and Selim Coury pay to himself, as trustee in bankruptcy, the sum of $4,280, as the value of merchandise fraudulently transferred to the said Courys by the bankrupts, and credited by them on their account against the bankrupts. I will not allow interest upon this sum. A decree may be presented not inconsistent with this opinion. The plaintiff recovers costs against the defendants Amos and Selim Coury; but no costs against the other defendants.